LAY *et al. v.* BLUE DIAMOND COAL CO.

*(Knoxville,* September Term, 1953.)

Opinion filed December 11, 1953.

Rehearing denied February 11, 1954.

POORE, COX, BAKER & McAULEY, of Knoxville, for petitioner.

BOYCE GRIFFITH, of LaFollette, for respondent.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

On the day that Lay was first employed as a coal miner by Blue Diamond Coal Company he was found at his place of work by a fellow employee in an unconscious condition. This was on March 9, 1951. He was taken immediately to the hospital, and died there on April 24, 1951. The immediate cause of death was thrombosis.

His widow, in behalf of herself and their five minor children, instituted suit for compensation under the provisions of the Workmen's Compensation Law, Code, Section 6851 et seq. Her petition was dismissed by the Judge after a full hearing. His finding was that she had "failed to establish by a preponderance of the evidence that deceased died as a result of an accidental injury arising out of his employment". The case is in this Court on the appeal of Mrs. Lay.

It is insisted in behalf of Mrs. Lay that all the evidence, and none of it contradicted, is to the effect that the death of her husband was the result of an accidental injury arising out of, and in the course of, his employment. Blue Diamond Coal Company, the employer, offered no proof. The merits, therefore, of this insistence must be determined by the evidence which Mrs. Lay introduced.

Mr. Lay was thirty-six years old at time of death. He and Mrs. Lay were married sixteen years before. During that interval he had never been sick a day until the occurrence now being considered. In the first year of his marriage his application for employment as a miner with some coal company was denied after a physical examina-

tion disclosed that he had high blood pressure. He promptly procured a job as a miner with some other company. He worked as a miner for that company and two or three others in succession continuously until a few months before the happening of the injury here under investigation. His employment as a miner then ceased because there was no more coal in the mine where he was last employed. After working about three months in Detroit, he came home and was given this job by the appellee, Blue Diamond Coal Company. Before giving him the job, its doctor examined him and learned that he did have high blood pressure.

Each miner for this coal company is assigned a particular area called a "room" in which to work. These rooms are considerable distances from the main entrance to the mine. A railroad track runs from this main entrance down through the mine. These rooms are off from, and to the sides of, this track. The miners are transported over this track from the mine entrance by a railroad car of some character to a point in the vicinity of the room to which the miners, respectively, are assigned. There the miners alight from this car and by a cross-entrance proceed on foot to the rooms to which they are, respectively, assigned.

The distance from the floor to the ceiling of the cross-entrance way with which this case is concerned is approximately forty inches. Therefore, when Lay alighted from the railroad car he was compelled to travel to his room either on his hands and knees or "humped" over in this forty-inch space.

Lay had been assigned room No. 12. Witness Brooks had been assigned room No. 11. They were transported from the main entrance to the cross-entrance on the same

car and were let off at the same place. During this trip Lay gave no evidence of feeling ill or of being in pain. Nor had he given any such appearance when he left home that morning.

Witness Brooks and deceased proceeded through this cross-entrance to their respective rooms a distance of between 500 and 800 feet. Each traveled this distance on hands and knees or "humped over", as aforesaid. The uncontradicted proof is that traveling in such a manner "is a right smart harder" and while so traveling the miner is "in a strain all right".

Witness Brooks entered room No. 11. Deceased walked on to the entrance of room No. 12 in company with his foreman who remained in the room a very few minutes, and then passed through an opening called "leeway" into room 11 where he remained with witness Brooks from three to five minutes. Almost immediately after he left Brooks heard Lay groaning. He called to this foreman, and then went directly into room 12 with the foreman "right on behind" him. Lay was prostrate on his back and unconscious. A shovel intended to be used in his work was by his side. There was no evidence that he did any work after entering the room.

Thus, the uncontradicted evidence is that in not less than five, nor more than ten, minutes after Lay had undergone this strain exacting walk of 500 to 800 feet he was found unconscious at his post of duty. There was no exterior evidence of violence.

Lay was immediately carried to the hospital and placed in charge of Dr. W. E. Smith, an eminent specialist in that branch of medicine which has to do with the circulatory system, etc. of the blood in the human body. As soon as the patient's condition permitted, Dr. Smith

made the examination and test necessary to pinpoint the trouble and its seat. He thereby ascertained that Lay had suffered "a spontaneous rupture of an intracranial artery" at a point where there was "a congenital aneurysm".

A congenital aneurysm is one "produced by a developmental defect in the wall of the vessel (artery), in which the muscular coat of the vessel is absent at a particular point and allows the weaker lining and coating membranes to bulge upward". That is, it is a swelling. High blood pressure is more likely to cause a rupture at such a place on an artery than elsewhere on that artery.

At the time Lay entered the hospital "the back of his eyes showed small hemorrhages of the blood vessels there—indicating increased intracranial pressure". This condition indicated a high blood pressure.

Physical exertion brings about "an immediate increase in pressure" of the blood. And "any physical exertion taken by a man having a lesion such as Mr. Lay had would increase his blood pressure" and "such increased blood pressure would unequivocally make a rupture of a weak spot in his artery more likely", according to the testimony of Dr. Smith. He says that such high blood pressure "would continue for a matter of several minutes" after the cessation of the physical exertion which caused the increase. He was found unconscious within a few minutes after he had completed the strain producing journey from the railroad car to the room to which he had been assigned.

Dr. Smith expressed the opinion that there was a direct relationship between the exertion to which Lay had been subjected just before he was stricken and the rupture which was found to exist. It is the insistence, however,

of Blue Diamond Coal Company that the undisputed proof is that the cause of Mr. Lay's death was not a ruptured artery but thrombosis brought on by an operation on April 19.

Dr. Smith testifies that an aneurysm does not necessarily result in a rupture, but that once a rupture has occurred there is a quite strong likelihood of a recurrent attack in the first two to four weeks following the original rupture, and that about half of those who suffer a recurrent attack do not survive. In order to avoid this subsequent attack upon Mr. Lay with its likely result an operation was had on April 2 for the purpose of tying off some of the blood flow to this artery. This tended "to reduce the direct force of the blood stream to the region of the aneurysm". Mr. Lay stood that operation very well, but in an attempt to further reduce the pressure another operation was had on April 19. A few hours thereafter he gave evidence of paralysis, and died on April 24 of thrombosis of the right middle cerebral artery.

The necessary conclusion from the evidence stated is that there is a direct relation between the rupture and the operation which immediately caused the thrombosis. The rupture necessitated the operation. Dr. Smith's testimony is that "there is a relationship between the rupture of which we have been speaking and Mr. Lay's ultimate death". There is no evidence to the contrary.

The only reasonable conclusion which may be reached from the testimony related is that the physical strain to which Mr. Lay was subjected in the course of his employment resulted in a ruptured artery through increased blood pressure and his death was thereby brought about. All the evidence is to this effect. The Circuit Judge, in reaching the opposite conclusion, said that "conjecture

and speculation must be indulged in to conclude that deceased suffered an injury by accident that arose out of his employment''.

Perhaps the Trial Judge, in his conclusion as to speculation, failed to draw the distinction between speculation, as that word is ordinarily understood, on the one hand, and expert medical opinion, on the other hand. That matter was considered and the distinction drawn in the recent case of *Patterson Transfer Co.* v. *Lewis,* 195 Tenn. 474, 260 S. W. (2d) 182, 183-184, opinion in which was announced subsequent to the decision by the Trial Court of the instant case. In that case the employee died from a heart attack suffered while he was unloading some plumbing fixtures. He was afflicted with ''coronary arteriosclerosis''. There was expert testimony to the effect that his exertion in unloading the plumbing fixtures was ''a contributing and accelerating factor.'' On that testimony a recovery under the Workmen's Compensation Act was upheld by this Court with the statement that: ''It is now well established that ordinary and usual exertion at work resulting in injuries is compensable. Awards have been upheld on the basis of accidental injury where the strain in tightening a nut in the ordinary manner, caused an aneurism to break''. By way of illustrating the justice and good sense of this rule, the Court, quoting from a Maine case, Brown's Case, 1924, 123 Me. 424, 123 A. 421, 60 A. L. R. 1293, said: '' 'If a laborer performing his usual task, in his wonted way, by reason of strain, breaks his wrist, nobody would question the accidental nature of the injury. If instead of the wrist it is an artery that breaks, the occurrence is just as clearly an accident.' ''

It is further insisted in behalf of Blue Diamond Coal Company, if we correctly understand the insistence, that

the physical exertion necessary to the performance of his duties as a miner were more than Lay could stand in his afflicted condition; hence, that compensation should not be allowed. The holding in the Patterson Transfer Co. case, supra, impliedly rejects this unique insistence. Another principle by reason of which it must be rejected is that stated in *Swift & Co.* v. *Howard,* 186 Tenn. 584, 591, 212 S. W. (2d) 388, 391, to the effect that when "an employer employs a workman he takes him as he is and assumes the risk of having a weakened condition aggravated by some injury which might not hurt or bother a perfectly normal, healthy person."

In Code Section 6852 it is provided that where an individual has been in the employment of his employer for so short a time as to make it impracticable to compute his average weekly wage as defined by the Act, then regard shall be had to the average weekly wage of a fellow employee of the same grade and character of work during the fifty-two weeks period preceding. The undisputed evidence in this case is that the average weekly wage of such an employee was not less than $50.

The adjudication of this Court is that all the evidence without contradiction is to the effect that the death of Lay was the result of an accidental injury arising out of, and in the course of, his employment and that his widow is entitled to recover from his employer, Blue Diamond Coal Company, for herself and children the amount provided by the Workmen's Compensation Law for death of an employee whose average weekly wage is $50. The decree of the Circuit Judge to the contrary will be reversed and the cause will be remanded for the entry of a judgment in accordance with this opinion in the amount

and payable at the times provided by the Workmen's Compensation Law, and for such further proceedings as may be necessary. All costs will be adjudged against appellee, Blue Diamond Coal Company.